# United States Court of Appeals
## for the Fifth Circuit

### UNITED STATES OF AMERICA
*Plaintiff-Appellee*,

### v.

### QUINTAN COCKERELL
*Defendant-Appellant*.

On Appeal from the United States District Court for the
Northern District of Texas,
Dallas Division, No. 3:18cr00623

## APPELLANT QUINTAN COCKERELL'S OPENING BRIEF

  */s/ Andrew S. Feldman__*
Feldman Firm PLLC
150 Southeast 2nd Avenue, Suite 600
Miami, Florida 33131
Office:                305.714.9474
Email:                afeldman@feldmanpllc.com
*Attorney for Appellant Quintan Cockerell*

## CERTIFICATE OF INTERESTED PERSONS

I certify that the following individuals may have an interest in the outcome of this case. I make these representations in order that the members of this Court may evaluate possible disqualifications or recusal.

1. United States of America
2. Honorable Karen Gren Scholer
3. Marlo Pfister Cadeddu
4. John D Cline
5. Richard Roper
6. Brett Rector
7. Ellisa M McClure
8. Javan Porter
9. Peter Koski
10. Adam Stempel
11. Cameron Smith
12. Molly Brown
13. James Jacks
14. Jay Ethington
15. Jeff Ansley
16. Adrianna Goodman
17. Katherine Devlin
18. Samuel Deau
19. Brady Wyatt
20. Robert Castle
21. Shirley Baccus-Lobel
22. Benton Williams
23. Derek Staub
24. Christopher Knox
25. William C. McMurrey
26. Sara Wirskye
27. David Schick
28. Lucas Garcia
29. Steve Sumner
30. Christopher Lewis

31. Lee Hirsh
32. Adrien Frazior
33. Katherine Payerle
34. Jacqueline DerOVanesian
35. Sara Clingan
36. Timothy Coley
37. Brynn Scheiss
38. Allan Medina
39. Brandon McCarthy
40. Scott Schuster
41. Dustin Rall
42. George Paret
43. Quintan Cockerell
44. Turner Luke Zeutzius
45. Michael Rannelle
46. Jonathan Le
47. Richard Hall
48. Andrew S. Feldman

_/s/ Andrew S. Feldman_

## STATEMENT REGARDING ORAL ARGUMENT

Quintan Cockerell requests oral argument. The issues in this case are complex and raise new, complex issues related to the application of the federal Anti-Kickback statute in cases involving the performance of lawful marketing services where there is no indication that there was any intent to unduly influence a patient's selection of health care services. It therefore involves the application of this Circuit's opinions in *United States v. Marchetti*, 96 F.4th 818, 824-827 (5th Cir. 2024) and *United States v. Miles*, 360 F.3d 472, 481 (5th Cir. 2004).

Moreover, this appeal raises significant issues related to the imposition of massive multi-million-dollar restitution judgments in contravention of this Circuit's precedent in *United States v.* 922 F.3d 639, 658 (5th Cir. 2019)

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..........................................................4

STATEMENT REGARDING ORAL ARGUMENT................................................6

STATEMENT OF JURISDICTION ......................................................................12

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................................13

STATEMENT OF CASE ......................................................................................14

  Indictments ......................................................................................................14

STATEMENT OF FACTS ...................................................................................15

SUMMARY OF THE ARGUMENT .....................................................................23

ARGUMENT AND AUTHORITIES ...................................................................25

  ISSUE ONE: WHEN VIEWED IN THE LIGHT MOST FAVORABLE TO THE
  JURY'S VERDICT, THE EVIDENCE ADDUCED BY THE GOVERNMENT
  IS INSUFFICIENT TO SUPPORT COCKERELL'S CONVICTIONS (COUNTS
  1, 4, AND 8) .......................................................................................................25

    Standard of Review ...........................................................................................25

  A.  THE GOVERNMENT DID NOT PROVE COUNT 4 UNDER
  MARCHETTI AND MILES ...............................................................................26

B.   THE GOVERNMENT DID NOT PROVE AN ESSENTIAL ELEMENT OF

COUNT 1 – COUNT 4..........................................................................30

C.   THE GOVERNMENT DID NOT PROVE COUNT 8 BECAUSE THE

SPECIFIED UNLAWFUL ACTIVITY SUPPORTING COUNT 8 WAS COUNT

4 …………………………………………………………………..31

D.   ISSUE TWO: EVEN UNDER PLAIN ERROR REVIEW A NEW TRIAL IS

WARRANTED BASED ON MISSTATEMENTS OF THE LAW MADE

DURING CLOSING ARGUMENTS WHICH PREJUDICED THE OUTCOME

OF THE TRIAL..................................................................................33

E.   ISSUE THREE: THE TRIAL COURT ABUSED ITS DISCRETION WHEN

IT ORDERED RESTITUTION UNDER THE MANDATORY RESTITUTION

VICTIM ACT (MVRA) IN THE AMOUNT OF NEARLY 60 MILLION

DOLLARS.........................................................................................37

CONCLUSION ....................................................................................41

CERTIFICATE OF SERVICE ...............................................................42

# TABLE OF AUTHORITIES

**Cases**

*Brown v. Dir., TDCJ-CID*, 3:19-cv-2301-L-BN, at *90 (N.D. Tex. Aug. 10, 2022)

.................................................................................................32

*Candler v. United States,* 146 F.2d 424, 426 (5th Cir. 1944)...................................25

*In re Winship*, 397 U.S. 358, 363 (1970) ..................................................29

*Marchetti*, at 827 ........................................................................31

*Michaud v. United States,* 350 F.2d 131, 133 (10th Cir. 1965 ................................30

*Patterson* v. *New York*, 432 U.S. 197, 210 (1977)....................................29

*United States v. Adams*, 363 F.3d 363, 365 (5th Cir. 2004). ...................................36

*United States v. Barnes,* 979 F.3d 283, 295 (5th Cir. 2020.....................................24

*United States v. Barnes,* 979 F.3d 283, 295 (5th Cir. 2020) ..................................24

*United States v. Beaulieu* 973 F.3d 354, 361-62 (5th Cir. Aug. 31, 2020 ......... 32, 35

*United States v. Cooper*, 38 F.4th 428, 432 (5th Cir. 2022),...................................24

*United States v. Dickerson*, 909 F.3d 118, 129–30 (5th Cir. 2018) ........................36

*United States v. Diggs*, 93 F.4th 845, 854 (5th Cir. 2024) ...................................37

*United States v. Fitzharris*, 633 F.2d 416, 422 (5th Cir. 1980).............................25

*United States v. Ganji*, 880 F.3d 760 (5th Cir. 2018)....................................... 24, 25

*United States v. Herberman,* 583 F.2d 222, 231 (5th Cir. 1978) ............................25

*United States v. Marchetti*, 96 F.4th 818, 824-827 (5th Cir. 2024)................. passim

*United States v. Maseratti,* 1 F.3d 330, 337 (5th Cir. 1993) ....................................25

*United States v. Mazkouri*, 945 F.3d 293, 304 (5th Cir. 2019) ...............................37

*United States v. Miles*, 360 F.3d 472 (5th Cir. 2004) ....................... 6, 24, 25, 32, 34

*United States v. Ricard*, 922 F.3d 639, 658 (5th Cir. 2019); ............................ 36, 37

*United States v. Robinson*, 87 F.4th 658, 674-75 (5th Cir. 2023) ...........................32

*United States v. Sharma*, 703 F.3d 318, 324 (5th Cir. 2012) ..................................38

*United States v. Williams,* 602 F.3d 313, 315 (5th Cir 2010)). ...............................24

**Statutes**

18 U.S.C. § 3664 ...................................................................................................37

18 U.S.C. § 3664 (e) .............................................................................................36

18 U.S.C. § 3742 ...................................................................................................11

18 U.S.C. §371 ......................................................................................................19

18 U.S.C. Section 1957 .........................................................................................19

28 U.S.C. § 1291 ...................................................................................................11

42 U.S.C. Section 1320a-7b ..................................................................................15

*42 U.S.C.* Section *1320a-7b(b)1* .........................................................................20

*18 U.S.C.* Section 2 .............................................................................................20

U.S.S.G. Section 2B4.1 .........................................................................................21

**Rules**

Fed. R. App. P. 4(b)(1)(A)..........................................................................10

Fed. R. Crim. P. 29(a) and (c)(1)................................................................22

## STATEMENT OF JURISDICTION

Cockerell appeals the Judgments of Conviction on Counts 1, 4, and 8 returned by the jurors. ROA 1675-76. The district clerk entered the Judgments of Conviction and Sentence on July 17, 2024. ROA 1879-1885. Cockerell filed Notice of Appeal on July 29, 2024.  ROA 1889.

The district court entered the final order of restitution on July 17, 2024. ROA 1879-1885.

This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Fed. R. App. P. 4(b)(1)(A)

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether under *Marchetti* and *Miles* there was sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Mr. Cockerell was guilty of Counts 1, 4, and 8 where, as here, those convictions were each premised on violations of the federal Anti-Kickback Statute arising from the lawful conduct of receiving payments for introducing a sales and marketing professional to a health care provider, the pharmacy.

2. Whether Mr. Cockerell is entitled to a new trial based on misstatements of the law related to the federal Anti-Kickback statute repeatedly made by the government during closing and rebuttal statements.

3. Whether the court erred in imposing a restitution judgment in contravention of this Circuit's decision in *United States v. Ricard.*

.

## <u>STATEMENT OF CASE</u>

**Indictments**

On or about December 12, 2018, Mr. Cockerell along with 7 other defendants were indicted in the Northern District of Texas (ROA 46-62). On May 13, 2020, a superseding indictment was returned against Mr. Cockerell (ROA 416-444) alleging kickback offenses, money laundering offenses, and conspiracy. (ROA 416-444)

Following a jury trial, Mr. Cockerell was convicted of Counts 1, 4, and 8 but *acquitted* of Counts 7, 10 and 12 (money laundering counts). ROA 1675-76. In the Superseding Indictment, Counts 2, 3, 4, and 5 were specifically incorporated as elements of the Count 1 conspiracy, as overt acts. ROA 431.

**Sentencing and Restitution Judgment**

On July 17, 2024, Mr. Cockerell was sentenced to 29 months of imprisonment and ordered to pay restitution jointly and severally with 5 other co-defendants in the amount of $59,879,871.00. ROA 1879-1885; ROA 3830:10-25.

# STATEMENT OF FACTS
## Background

Mr. Cockerell is an experienced sales and marketing professional who owned a sales and marketing company known as Q Spine LLC. His sales and marketing experience began with spinal implants (ROA 2436, ROA 2851) which was a successful business (ROA 2890). In or around May of 2014 Mr. Cockerell began marketing compounded medications (ROA 416-444) as an alternative to addictive opioids. Mr. Cockerell was performing work that was "similar to what he was doing in the medical sales world with spine. He was selling something from the pharmacy. It was like pharmaceutical sales and medical sales." ROA 2856:3-10. Two of the pharmacies that dispensed these specialty medications were RxPress Pharmacy and Xpress Compounding. (ROA 416-444)

Mr. Cockerell's wife, Kristin Najarian, at one time was an employee of Q Spine LLC and assisted with the spinal implants business for several years. ROA 2851-2852. In that role, Mrs. Najarian went into an office and performed administrative tasks, including creating Excel spreadsheets, creating invoices, sending out purchase orders, responding to emails and writing emails. ROA 2851-2852, and ROA 2877. Because of this previous experience, Mr. Cockerell asked Mrs. Najarian to work for the pharmacy and Mrs. Najarian signed paperwork to become a W-4 with Texas SurgiSource which contemplated employment with Xpress Compounding. (See GX

411/174-174A). ROA 2859-2861. Mrs. Najarian did not visit the pharmacy, and she did not speak to Mr. Cockerell about her role as a W-4 with the pharmacy. ROA 2863-2864. However, Mrs. Najarian received checks from the pharmacy. ROA 2872-2873.

### Count 4: 42 U.S.C. Section 1320a-7b (the federal Anti-Kickback statute or AKS)

On May 18, 2015, Mr. Cockerell's ex-wife received compensation in the amount of $1,723.53 from Xpress Compounding. ROA 433. That compensation was based on a prescription that Dr. Ince prescribed for patient LL which was filled by Xpress Compounding after Dr. Ince transmitted the prescription to that pharmacy. (ROA 3436:9-18)

The government did *not* call Dr. Ince as a witness. Instead, the government called Steve Bergman, a marketer for Xpress Compounding, who marketed compounded medications to doctors, including Dr. Ince, who testified as follows:

> Q. Can you explain to me -- well, let me just -- to speed it up, let me ask you some questions. An override payment is basically, you kind of brought somebody in to this business, and so you're going to get a percentage of whatever business they generate; is that accurate?
> A. Oh, that's -- yeah.
> *Q. So if Mr. Cockerell had an override on your doctors, that would be because he introduced you or played some role in you starting with the pharmacy?*
> *A. Oh, yeah.*
> Q. Were you your own salesperson then after you started with the pharmacy?

A. Yes.

Q. You and Quintan Cockerell didn't do anything jointly or together on Xpress Compounding after you got started?

A. No. We were separate.

Q. Is that normal in your industry? A. That's very -- that's basically the -- the way it is, yes.

Q. Does that mean that Mr. Cockerell somehow had any influence whatsoever in what your doctors wrote for prescriptions?

A. No.

Q. Okay. Let's go a step further. Who is Christopher Ince, I-n-c-e?

A. He's a physician.

Q. Is that a -- was that a physician -- was Mr. Ince a physician that was tagged to you at Xpress Compounding?

A. Yes.

*Q. To the very best of your knowledge, did Mr. Cockerell ever talk to Dr. Ince at all?*

*A. I'm not aware. I don't...*

Q. Would it surprise you if he did? I mean, let me -- that's not a very clear question. Dr. Ince is your doctor, right?

A. That is correct.

Q. Do you trust Mr. Cockerell not to try and poach your doctors from you?

A. Oh, yeah.

Q. And so you would be the rep dealing with Dr. Ince?

A. Yes.

Q. Okay. You said that you were compensated when a physician wrote a script for a patient, right?

A. Correct.

Q. Okay. From Xpress –

A. Well, not when they wrote a script but –

Q. Okay. Fair. When it was adjudicated and the claim was paid?

A. Yes.

Q. All right. And did you ever refer a patient specifically to a doctor in order to get paid?

A. No.

*Q. Did you ever have any interaction with patients when they were choosing doctors?*

*A. Absolutely not.*

> ***Q. Did you ever go to a doctor, let's say Dr. Ince, and say, Doc, I recommend or suggest a specific good or service or item or product be provided to this patient?***
> A*. No. Not -- no.*
> Q. Would you ever do that?
> A. *No. The -- the role that we have is informing them of what tools we -- we think may help their practice.*
> Q. Okay. Such as medications or hardware for a surgery?
> A. Correct.
> Q. ***All right. So when you were compensated when that prescription was filled and the claim was paid, were you paid a kickback or a commission?***
> ***A. A commission.***[1]

Mr. Cockerell had no interactions with Dr. Ince. Likewise, Mr. Cockerell never discussed (or controlled) the marketing practices with Mr. Bergman. ROA 2918:1-6 (Q. Okay. Did you ever have conversations with Quintan Cockerell about your marketing practices? A. I don't recall anything specific. Q. Did Quintan ever ask you about your marketing practices? A. No.). Mr. Cockerell received an "override" which Mr. Bergman testified was compensation for *introducing* Mr. Bergman to a pharmacy. ROA, 2907:6-2908:25, ROA 2910-2911:2 (Bergman Cross-Examination). Mr. Bergman also testified that overrides were a common industry practice. ROA 2916:18-25. And those overrides were paid to avoid poaching between sales and marketing representatives. ROA 2917:1-4 ("Q. So you're saying

---

[1] ROA, 2907:6-2908:25, and ROA 2910-2911:2 (Bergman Cross-Examination)

-- are you saying that Quintan Cockerell getting an override on your prescriptions would prevent him from poaching your doctors? A. I would -- yeah.”).

Finally, Mr. Bergman testified that he believed that he engaged in awful conduct when he received a commission. ROA 2908:23-25.

The only doctor's testimony came from defense witness, Dr. Anderson, a level 1 trauma podiatrist who testified:

> Q. All right. And you said that -- but then you would fax that form into the pharmacy, right?
> A. I don't -- I assume, but I would just be assuming. Somebody in my office would -- would -- somebody in my office would fax it to a pharmacy.
> Q. Well, specifically, you faxed it to either Xpress or Rxpress, right, because that's the pharmacy that gave you the pad?
> A. ***No. It depends on -- it depends on -- there's multiple dependent factors for that***.

ROA 3436:9-18 (Dr. John Anderson Cross Examination).

Dr. Anderson recalled using a prescription pad and faxing prescriptions to pharmacies including Xpress Compounding and RxPress Pharmacy. ROA 3435: 21-23 (“I mean, a prescription pad could be used for anybody. It was -- it was from them [Xpress Compounding and RxPress Pharmacy] but, yes, it can be used any -- at any compounding pharmacy.”).

**B.     Count Eight (Money Laundering in violation of 18 U.S.C. Section 1957)**

The subject transaction in the Superseding Indictment was a payment of $75,928.51 on *May 18, 2015*, from a joint account controlled by Mr. Cockerell and his ex-wife, Mrs. Najarian. ROA 416-444. The Superseding Indictment included two possible specified unlawful activities (conspiracy to defraud in violation of 18 U.S.C. Section 371 or a violation of the AKS). ROA 416-444. That transaction occurred the same day as Count 4 payment of $1,723.53 and the government described this as "Quintan Cockerell is charged with one count of a specific instance when he received one of those *illegal kickbacks* through his wife." (ROA 2431: 14-16).

The government's accountant, Mike Petron, testified about incoming and outgoing transactions in the Wells Fargo account from August of 2014 until May 18, 2015. (ROA 3251-3291). Yet, Mr. Petron never testified about the specifics of any of those transactions and merely segregated the deposits into the Wells Fargo account between (i) Xpress Compounding compensation and (ii) sources other than compensation from Xpress Compounding. (ROA 3251-3291

**C.     Count One (Conspiracy to Defraud in Violation of Section 371)**

Count One charged an 18 U.S.C. §371 conspiracy to defraud the government through dishonest or deceitful means. At trial, the court instructed the jurors on the

elements of that Count One conspiracy, including "that at least one of the conspirators during the existence of the conspiracy ***knowingly committed at least one of the overt acts described in the superseding indictment."*** ROA 421

Despite this, the Superseding Indictment presented to the jury during Mr. Cockerell's trial described the ***overt act*** that the government was required to prove beyond a reasonable doubt, as an element of the Count One Conspiracy, "***that is, the payments for beneficiary referrals reflected in Count Four below."*** *See* ROA 2413.

That Superseding Indictment provided to the jurors did ***not*** include Counts Two, Three, or Five as a possible overt act, and was ***narrowed to only include Count 4.***

"In furtherance of the conspiracy and to accomplish its object and purpose, the conspirators committed and caused to be committed in the Dallas Division of the Northern District of Texas and elsewhere ***the following overt acts***; that is, the payment for beneficiary referrals reflected in Count 4 below.

***Count 4, receipt of kickbacks. Violations of 42 U.S.C. Section 1320a-7b(b)1 and 18 U.S.C. Section 2.***" ROA 2413:1-8.

The government then described that charge to the jurors:

- "Count 4. Defendant Quintan Cockerell,

- Beneficiary initials L.L.,

- Approximate dates of payment, 5-18-2015.

- Approximate kickback amount, $1,723.53.

- Description of the payment. Direct deposit voucher 5262996 DD made payable to Person A for the benefit of Quintan Cockerell.

All. In violation of Title 42, United States Code Section 1320a-7b(b)1 and Title 18, United States Code, Section 2." (ROA 2414:4-11.)

## D. **The Restitution Judgment**

After the district court found that the improper benefit under U.S.S.G. Section 2B4.1 was a loss amount of $59,879.81, the court incorporated those findings in determining that was the amount of restitution under the Mandatory Victim Restitution Act (MVRA). ROA 3830:10-25. Put another way, there was no restitution hearing, just a restitution judgment which incorporated the Section 2B4.1 amount found by the district court. *Id.*

## SUMMARY OF THE ARGUMENT

No court has ever held that the federal Anti-Kickback statute criminalizes payments for *introductions* to health care providers. Here, Mr. Cockerell's convictions rest entirely on this specious premise – that Mr. Cockerell can be convicted and imprisoned for receiving $1,723.53, indirectly through his wife, for introducing another sales and marketing professional to a pharmacy. For this reason alone, the government cannot salvage Mr. Cockerell's convictions.

Against the backdrop of *Miles* and *Marchetti,* the government cannot meet its burden to prove a substantive violation of the federal Anti-Kickback statute without proving inducement, a connection to the relevant decision-maker, ***and*** the intent to exercise undue influence on patients' selection of services.

Here, there was no such proof that Mr. Cockerell had any involvement or participation in any conduct or communications which gave rise to Dr. Ince's order for a compounded medication for beneficiary LL which was dispensed by Xpress Compounding. Instead, Steve Bergman was the sales and marketing professional with whom Dr. Ince interacted and there was no evidence that Mr. Bergman controlled or selected the pharmacy where LL's compounded medication was dispensed. Without this critical evidence, Mr. Cockerell's conviction for Count 4 must be reversed.

Furthermore, because Counts 1 and 8 are inextricably intertwined with Count 4, this same lack of proof taints those convictions (Counts 1 and 8) and mandates reversal. The government narrowed Count 1 to include Count 4 as the *only overt act,* and by doing so, converted Count 4 into an element of Count 1. Likewise, Count 8 was premised entirely on that same May 18, 2015 conduct. And so, Counts 1 and 8 must fail for the same reasons as Count 4.

In addition, Mr. Cockerell is entitled to a new trial because of the government's misstatements of the law regarding commission-based compensation, the requirement to meet a safe-harbor which is voluntary, and the illegality of receiving compensation for recommending products which is a permissible form of advertising under *Marchetti* and *Miles.* These statements amounted to plain error, and impacted the outcome of the trial, warranting a new trial.

Lastly, the restitution order must also be vacated because it contravenes *United States v. Ricard* which requires the government, in a kickback case, to prove fraud– either through loss caused by fraud *or* through a loss caused by a lack of medical necessity – which they did not do here.

# ARGUMENT AND AUTHORITIES

**ISSUE ONE: WHEN VIEWED IN THE LIGHT MOST FAVORABLE TO THE JURY'S VERDICT, THE EVIDENCE ADDUCED BY THE GOVERNMENT IS INSUFFICIENT TO SUPPORT COCKERELL'S CONVICTIONS (COUNTS 1, 4, AND 8)**

## Standard of Review

Mr. Cockerell preserved his challenge to the sufficiency of the evidence in a motion for judgment of acquittal at the close of the evidence and in post-verdict motions for judgment of acquittal. Fed. R. Crim. P. 29(a) and (c)(1). (ROA 8996-9019, 2302-2339) Preserved challenges to the sufficiency of the evidence are reviewed *de novo*. Under that standard this Court "reviews the record to determine whether, considering the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Barnes,* 979 F.3d 283, 295 (5th Cir. 2020); *United States v. Miles*, 360 F.3d 472, 478 (5th Cir. 2004) (vacating a jury conviction when "a rational jury could not find" an essential element of the crime). Assessing the sufficiency of the evidence requires determining what conduct constitutes an offense, which is a question of statutory interpretation reviewed de novo. *United States v. Cooper,* 38 F.4th 428, 432 (5th Cir. 2022), (citing *United States v. Williams,* 602 F.3d 313, 315 (5th Cir 2010)). A verdict may not, as here, "rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Ganji*, 880 F.3d 760 (5th Cir.

2018). Although the jury may make factually based inferences, "a conviction cannot rest on an unwarranted inference, the determination of which is a matter of law." *United States v. Fitzharris*, 633 F.2d 416, 422 (5th Cir. 1980) (emphasis added).

Under this framework, "[t]he evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilty," but the Government "must do more than pile inference upon inference." *United States v. Maseratti,* 1 F.3d 330, 337 (5th Cir. 1993) (citations omitted)."); *Candler v. United States,* 146 F.2d 424, 426 (5th Cir. 1944) (reversing conviction when evidence of willful intent was as consistent with innocence as it was with guilt); *United States v. Herberman,* 583 F.2d 222, 231 (5th Cir. 1978) ("[A] trial judge has the duty to grant the motion for judgment of acquittal when the evidence, viewed in the light most favorable to the government, is so scant that the jury could only speculate as to defendant's guilt."").

## A. THE GOVERNMENT DID NOT PROVE COUNT 4 UNDER MARCHETTI AND MILES

Just as in *United States v. Marchetti*, 96 F.4th 818, 824-827 (5th Cir. 2024), the government failed to "prove that [Mr. Cockerell] intended to "improperly influence[]," those who make healthcare decisions on behalf of patients. And that is where the government dropped the ball." *Marchetti*, at 827; *United States v. Miles*, 360 F.3d 472, 481 (5th Cir. 2004).

Mr. Cockerell never exercised any such "undue influence" with respect to the prescription for compounded medication ordered by Dr. Ince for patient L.L., which is the subject of Count 4. Nor was there any evidence that Mr. Cockerell or Mr. Bergman improperly influenced doctor Dr. Ince *or* that Mr. Cockerell or Mr. Bergman controlled or decided to which pharmacy Dr. Ince sent his patients to fill certain prescriptions. Mr. Cockerell received an "override" which Mr. Bergman testified was ***compensation for introducing Mr. Bergman to a pharmacy***. ROA, 2907:6-2908:25, ROA 2910-2911:2.

No court has ever held that such conduct of receiving payments for introducing another marketer to a health care provider constitutes a substantive violation of the federal Anti-Kickback statute. Yet that was the government's theory of Count Four. *See* ROA 3653:11-13 ("he aided and abetted Berman by introducing him to the pharmacy bringing him in..") and one which *Marchetti* expressly renounced. *Marchetti*, at, 826 n.6, 827. There, this Circuit underscored that "Section 1320a-7b(A)/B) cannot be read so broadly to subsume permissible advertising activities. "[T]he government still need[ed] to prove something about [Cockerell's] exercising undue influence on patients' selection of services," *Marchetti*, at, 826 n.6, because "not every sort of influence is improper. (What are advertisers hired to do anyway?" *Marchetti,* at 827.

The government failed to show any influence let alone a connection. Simply stated, at best the evidence showed that (i) Cockerell's wife received money from Xpress Compounding (ii) that money was received in connection with reimbursements related to Dr. Ince's prescription for patient LL (iii) Dr. Ince only interacted with Mr. Bergman and never interacted with Cockerell **and** (iv) Mr Bergman had no control over Dr. Ince. This was insufficient to convict Cockerell of Count 4.

Another fatal blow to Count 4 under *Marchetti* and *Miles* is the complete absence of any interaction between Mr. Cockerell and any relevant decision maker in connection with Count 4. *Marchetti*, 96 F.4th 818, 826. n.8. This Circuit in *Marchetti* and *Miles* held that "interaction with the relevant decisionmaker has to be a part of the consideration in evaluating violations of the AKS." *Marchetti,* at 826 n.8. Yet, like *Marchetti*, there was "nary a word about how [Cockrell] interacted" with any relevant decisionmakers," in connection with Count 4. *Id.* at 818.

Yes, Mrs. Cockerell's ex-wife Mrs. Najarian may have received money from the pharmacy and Mrs. Najarian may not have been a bona fide employee of the pharmacy but none of these immaterial facts alter the inescapable fact that there was no evidence at trial relating to Mr. Cockerell's interaction with Dr. Ince or Mr. Bregman in connection with the prescription Dr. Ince ordered for patient L.L. None.

Finally, there is another reason that Count Four must be reversed – the government conceded in closing argument that Mr. Cockerel was being paid for the sales and marketing activities of Mr. Bergman when it said "it doesn't matter that Adam Bergman did some of the ***actual marketing*** in this case because Quintin Cockerell got the money." See ROA 3653:10-11. Again, Marchetti rejected this as a basis for a violation of the federal Anti-Kickback statute reasoning that "[t]he closest the government comes to providing the missing link is its assertion that Marchetti had "relationships with, access to, and influence over" doctors. The first two prongs of this triptych broaden the scope of the AKS beyond what it can bear. It would allow payments to an advertising agency, just not an agency that hires marketers with experience in the industry. That would be a counterintuitive outcome." *Marchetti*, at 827. And so, the government's own words reveal that their theory of Cockerell's guilt is the "relationship with or access to" theory by another name that *Marchetti* plainly rejected. *Id.* at 827.

And so, Count 4 must be reversed.

## B. THE GOVERNMENT DID NOT PROVE AN ESSENTIAL ELEMENT OF COUNT 1 – COUNT 4

For the same reasons that the government failed to prove Count 4, the government failed to prove Count 1.

Due process requires that the government must prove every element of a charge beyond a reasonable doubt. *Patterson* v. *New York*, 432 U.S. 197, 210 (1977) (""the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged."); *In re Winship*, 397 U.S. 358, 363 (1970) ("The requirement of proof beyond a reasonable doubt has this vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction").

The government intentionally narrowed Count One in the Superseding Indictment to one overt act – Count 4. ROA 2413:1-8 and ROA 2414. In narrowing the Superseding Indictment in this way, Count 4 became an element of Count One that the government was required to prove beyond a reasonable doubt to the jurors. And, if there were any doubt about whether Count 4 was an element of Count 1 that the government was required to prove beyond a reasonable doubt, the trial court instructed the jurors that an element of Count 1 was the overt act in the Superseding

Indictment, which was Count 4. ROA. 421; ROA 3617:11-15. The jurors therefore could not find guilt beyond a reasonable doubt based on any other over act – it had to be Count Four. *Michaud v. United States,* 350 F.2d 131, 133 (10th Cir. 1965) ("Obviously, if the jury followed the mandate of the instruction a verdict of guilty could not have been found.").

Accordingly, because the government failed to prove Count 4, they failed to prove Count One which required that the government prove Count 4 as an element of the offense beyond a reasonable doubt.

## C. THE GOVERNMENT DID NOT PROVE COUNT 8 BECAUSE THE SPECIFIED UNLAWFUL ACTIVITY SUPPORTING COUNT 8 WAS COUNT 4

Count Eight charged Mr. Cockerell with Engaging in a Monetary Transaction in Property Derived from Specified Unlawful Activity, namely by receiving illegal healthcare kickbacks, on May 18, 2015, the same day as the "kickback" payment charged in Count Four. Importantly, the government also narrowed the Superseding Indictment to clarify that the specified unlawful activities were a (i) violation of 18 U.S.C. Section 371 and/or (ii) a violation of the Anti-Kickback statute. ROA 2416-2417. Because of this narrowing of the Superseding Indictment, and the narrowing of Count 1, the Count 1 Section 371 conduct could not be a specified unlawful activity absent the Count 4 violation of the Anti-Kickback statute on May 18, 2015 (which was the same day as the transaction comprising Count 8). Thus, the Count 4

conduct was the only possible conduct that the jurors could have relied on to convict Mr. Cockerell of Count 8. Below is a summary:

- Count 1: narrowed so that an element of the offense was Count 4

- Count 8: specified unlawful activities were Count 1 and Count 4

- And so, count 8 could not be based on any conduct other than Count 4

Therefore, for the same reasons that Count 4 fails, Count 8 must fail. There was no proof of *any specified unlawful activity* (Count 1 based on Count 4 *or* Count 4) supporting the Count 8 conviction because the specified unlawful activity was tethered to the Count 4 payment (the kickback conviction). *Marchetti*, at 827 ("Rather, the government must have produced something more. In particular, it needed to prove that Vantari and Marchetti intended "improperly [to] influence[ ]," those who make healthcare decisions on behalf of patients. And that is where the government dropped the ball").

.      Just as in Count 4, the government relied on the same flawed premise to convict Cockerell of Count 8 -- that commission-based compensation for marketing health care products or for introducing a marketer (Bergman) to a pharmacy is *per se* unlawful under the AKS – to illustrate that the $75,000 wire transfer to pay for Mr. Cockerell's portion of a yacht rental must be derived from that unlawful activity. *Marchetti* holds otherwise and warrants reversal of Count 8. *Id.* at 827.

**D. ISSUE TWO: EVEN UNDER PLAIN ERROR REVIEW A NEW TRIAL IS WARRANTED BASED ON MISSTATEMENTS OF THE LAW MADE DURING CLOSING ARGUMENTS WHICH PREJUDICED THE OUTCOME OF THE TRIAL**

The government's statements during closing and rebuttal argument must be sufficiently inflammatory and prejudicial to warrant a new trial. *United States v. Beaulieu* 973 F.3d 354, 361-62 (5th Cir. Aug. 31, 2020) (reversing conviction based on improper remarks made by prosecutors); *Brown v. Dir., TDCJ-CID*, 3:19-cv-2301-L-BN, at *90 (N.D. Tex. Aug. 10, 2022) ("The determining question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict, and, in answering that question, the court may consider the magnitude of the prejudicial effect of the statements; the efficacy of any cautionary instructions; and the strength of the evidence of the defendant's guilt"). Mr. Cockerell did not object to many of these statements, but the statements warrant reversal even under plain error review. *United States v. Robinson*, 87 F.4th 658, 674-75 (5th Cir. 2023) ("To establish plain error, defendant must show an error that was clear and obvious and that the error affected his substantial rights.").

Here, the government repeatedly misstated the law and told the jurors that the precise type of marketing that *Marchetti* and *Miles* expressly permit is a crime under the federal Anti-Kickback statute. They also asked the jurors to improperly and erroneously infer that, unless the sales and marketing professional is protected by a

*voluntary* safe-harbor known as the employee safe-harbor, they must be guilty of the crime of violating the federal Anti-Kickback statute.

- **Misstatement 1 (ROA 3652:17-25, 3653:1-7):** Now, the second and third item in this checklist is this remuneration, this money, was in exchange for referring or promoting, that is, recommending the ordering of a product or service that is reimbursed by federal insurance, TRICARE. And that's exactly what Quintan Cockerell did here. When he passed out these script pads, when he told doctors about the product, when he put Lock Paret on the phone with doctors to tell them how well these creams worked, that's what he was doing. ***He was marketing. He was recommending the specific products that these doctors were prescribing.*** That's what he was getting money for, and he was doing it over and over and over. He got these payments that you'll see in front of you because it was connected to those prescriptions.

- **Misstatement 2 (ROA 3653:9015)**: And members of the jury, ***it doesn't matter that Adam [sic] Bergman did some of the actual marketing in this case because Quintan Cockerell got the money. In addition, he aided and abetted Bergman by introducing him to the pharmacy, bringing him in***, dictating the breakdown of his commission payments and how that worked, as you'll see in this text message.

- **Misstatement 3** (**ROA 3708:6-14)**: And here's where I'll ask you to look at the law, is that the defense says that there's no law against marketing. Boy, that is misleading. He's right. There isn't a law against marketing. But there is a ***law against getting paid kickbacks for marketing. Yeah. Medical companies need marketers, and they can pay them. There's an exception for how. They have to be a bona fide employee.***

- **Misstatement 4 (ROA 3709:15-18)**: And because they deliberately failed to meet the exception, they're left with the rule, and that is this: ***You can't pay people to recommend a TRICARE product as an inducement.***

- **Misstatement 5 (ROA 3711:19-22):** That is recommending a product for the ordering -- that's recommending the ordering of a product. And that is what you're not allowed to get a kickback to do, but he took one anyway.

*Marchetti* and *Miles* compel the conclusion that these were incorrect statements of the law. *Marchetti*, at 824-27; *Miles*, at 481. The Fifth Circuit has never held that recommending a product is a violation of the AKS. That, if you do not fall into a voluntary employee safe harbor but you obtain compensation for marketing or recommending a product, you have violated the AKS. That there is a law against getting paid "kickbacks for marketing" (ROA 3708).[2] That you cannot pay people to recommend a product, or that recommending a product -absent more – is a type of undue influence recognized by this Circuit in *Marchetti* and *Miles* that may give rise to a violation of the AKS. Finally, the government's assertion that Mr. Cockerell dictated the breakdown of commission is misleading and irrelevant. *Marchetti,* at 824-827. Indeed, *Marchetti* dictates that the structure of the contracts– and the payments contemplated in those contracts (activity, commission based etc.) – cannot support an AKS conviction. *Marchetti,* at 827 ("[t]he structure of the contract alone is not sufficient evidence to produce a conviction under the AKS.").

---

[2] In context, this misstatement cannot be overlooked. *Marchetti* and *Miles* reinforce that compensation for marketing cannot sustain a kickback violation absent undue influence over the patient's selection of health care services. "[T]he government still need[ed] to prove something about [Cockerell's] exercising undue influence on patients' selection of services," *Marchetti*, at, 826 n.6, because "not every sort of influence is improper. (What are advertisers hired to do anyway?" *Marchetti,* at 827

The misstatements of the law were not isolated and they prejudiced the outcome of trial and substantially influenced the jurors' verdicts on Counts 1, 4, and 8. *Beaulieu* 973 F.3d at 361-62. Each of which were inextricably intertwined to whether Mr. Cockerell was guilty of a violation of the federal Anti-Kickback statute based on the May 15, 2015, payment to his ex-wife Mrs. Najarian which was an "override" Mr. Cockerell received for introducing Mr. Bergam to Express Compounding. Not for referrals. Not for unduly influencing Dr. Ince. Not for having any connection to the relevant decision maker.

In addition, when considered as a whole, the continuous comments about noncompliance with voluntary safe harbors and the continuous statements about kickbacks for marketing amply demonstrate that the jurors reached a verdict based on the constant government narrative about secretive payments to Mrs. Najarian as a sham employee. This was a side show though. The payment to Mrs. Najarian might have been concealed and Mrs. Najarian may not have been a bona fide employee, but those facts are immaterial to whether the payment to Mrs. Najarian was a payment in return for exercising undue influence over patient's selection of health care services. *Marchetti,* at 824-27. It was not.

And so, Mr. Cockerell is entitled to a new trial.

**E. ISSUE THREE: THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ORDERED RESTITUTION UNDER THE MANDATORY RESTITUTION VICTIM ACT (MVRA) IN THE AMOUNT OF NEARLY 60 MILLION DOLLARS**

A challenge to the legality of the restitution order is reviewed de novo. *United States v. Ricard*, 922 F.3d 639, 658 (5th Cir. 2019); *United States v. Adams*, 363 F.3d 363, 365 (5th Cir. 2004).

Here, the district court erred when it ordered restitution. There was no restitution hearing. The government introduced no witnesses or exhibits. The court also improperly shifted the entire burden of offsetting the loss to Mr. Cockerell without first demanding that the government prove beyond a preponderance of the evidence that the loss amount was $59,879,871.00. ROA 3813-3814. 18 U.S.C. § 3664 (e) ("The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."); *Ricard*, 922 F.3d at 658; *United States v. Dickerson*, 909 F.3d 118, 129–30 (5th Cir. 2018) ("The Government bears the burden to establish amounts for restitution and forfeiture, at which point the burden shifts to the defendant to prove the inaccuracy of the loss calculation.").

Compounding this error, the court determined that there was evidence that "many prescriptions were not legitimate.. at least some of the ingredients" (ROA 3812:6-10), but then conducted no further fact finding and shifted the burden to Mr.

Cockerell based on the finding that the fraud was "so pervasive that separating legitimate fraudulent conduct is not reasonable practicable" (ROA 3814:1-4). [3]

This was an error under *Ricard* because *Ricard* demands the government to meet its burden of proof before any burden shifting occurs. *Ricard,* at 658.

In addition, the court's heavy reliance on *United States v. Diggs*, 93 F.4th 845, 854 (5th Cir. 2024) and *United States v. Mazkouri*, 945 F.3d 293, 304 (5th Cir. 2019) was misplaced. *Diggs* involved classic patient recruiters paying cash for patients while operating group homes for vulnerable patients. Very similarly, *Mazkouri* involved a hospital scheme targeting vulnerable patients and fraudulent billing for partial hospitalization programs which are outpatient psychiatric services designed to provide intensive, daily treatment to patients who have been discharged from inpatient treatment or who suffer from an acute exacerbation of a chronic mental disorder. The conduct in *Mazkouri* and *Diggs* was permeated with fraud to the extent that no one could segregate legitimate versus illegitimate services. And in *Mazkouri* the pervasiveness of the fraud analysis was critical to the court's calculation of *intended loss*. [4] But, that analysis was not developed and was only

_____

[3] *See also* 18 U.S.C. § 3664 ("If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.")
[4] *Mazkouri*, 945 F.3d at 304 ("When fraud is so pervasive that separating legitimate from fraudulent conduct "is not reasonably practicable," "the burden shifts to the defendant to make a showing that particular amounts are legitimate." *Hebron* , 684

mentioned, in dicta, in the brief portion of the decision related to restitution. *Mazkouri*, at 306.

By stark contrast, the services here were not inherently illegitimate. Instead, the alleged conspiracy here involved the marketing of compounded medications that were authorized by doctors, dispensed and reviewed by pharmacists, and used by patients (whom the government never called). The district court seemed to even concede that there were some legitimate services but segregating illegitimate from legitimate would not be practical. (ROA 3812); *see also United States v. Sharma*, 703 F.3d 318, 324 (5th Cir. 2012) ("in health-care fraud cases, an insurer's actual loss for restitution purposes must not include any amount that the insurer would have paid had the defendant not committed the fraud."). In this situation, the Mandatory Victim Restitution Act (MVRA) does not permit the court to find an enormous restitution amount without engaging in further fact finding and analysis. *See* 18 U.S.C. § 3664 (e)

The government never met its burden based on a conclusory finding that the fraud was so pervasive that legitimate services were not identifiable. Even if the government had, Mr. Cockerell was never allowed to meet his burden to offset fraud.

---

F.3d at 563. In the absence of such evidence from the defendant, "the district court may reasonably treat the entire claim for benefits as ***intended loss***."")

Instead, that burden was shifted improperly to Mr. Cockerell under *Ricard*. The restitution order must be vacated.

## <u>CONCLUSION</u>

Mr. Cockerell's convictions should be reversed, or Mr. Cockerell should be awarded a new trial. Moreover, if this Circuit were to deny those requests, Mr. Cockerell's restitution order must be vacated and remanded for recalculation.

*/s/ Andrew S. Feldman*

CERTIFICATE OF SERVICE

I certify that the foregoing motion was this day electronically served on counsel of record through use of the Court's ECF system.

*/s/ Andrew S. Feldman*

CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of the 5th Cir. R. 32.2.7(b) and Fed. R. App. P. 32(f).

1. Exclusive of the exempted portion in 5th Cir. R. 32.2.7(b)(3) and Fed. R. App. P. 32(f), this brief contains 7257 words.

2. This brief has been prepared in proportionately spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2302) in Times New Roman typeface and 14-point font size.

3. The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Cir. R. 32.2.7, may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

*/s/Andrew S. Feldman*