No. 24-10687

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————————————

UNITED STATES OF AMERICA,

**Plaintiff-Appellee**

**v.**

QUINTAN COCKERELL,

**Defendant-Appellant**

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
NO. 3:18-CR-623-7 (HON. KAREN GREN SCHOLER)

————————————

**ANSWERING BRIEF FOR THE UNITED STATES**

————————————

ANTOINETTE T. BACON
Supervisory Official

KATHERINE PAYERLE            ANDREW W. LAING
Deputy Chief                 U.S. Department of Justice
BRYNN A. SCHIESS             Criminal Division, Appellate Section
Assistant Chief              950 Pennsylvania Ave. NW
JACQUELINE DEROVANESIAN      Washington, DC 20530
Trial Attorney               202.353.8433
Criminal Division, Fraud Section    andrew.laing@usdoj.gov

**STATEMENT REGARDING ORAL ARGUMENT**

The government does not oppose Defendant-Appellant Quintan Cockerell's request for oral argument.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.....................................i

TABLE OF AUTHORITIES ........................................................iv

JURISDICTIONAL STATEMENT.............................................1

STATEMENT OF THE ISSUES ...............................................1

STATEMENT OF THE CASE ...................................................1

    I.    Procedural History....................................................1

    II.    Statement of Facts ...................................................2

        A.    Cockerell works as a "marketer" for compounding pharmacies. ........................................................2

        B.    Cockerell and his co-conspirators use kickbacks to bring prescriptions to the pharmacies. ...............................4

    III.    Rulings Under Review ...............................................7

SUMMARY OF ARGUMENT ...................................................8

ARGUMENT ...........................................................................10

    I.    The Evidence Amply Supported Each Count Of Conviction.......10

        A.    Background ...................................................10

        B.    Standard of Review........................................11

        C.    Discussion....................................................12

            1.    Cockerell's challenge to his substantive Anti-Kickback Statute conviction lacks merit.................12

                a.    Cockerell and Bergman accepted kickbacks in return for Bergman's improper

recommendation and obtainment of prescriptions for the pharmacies. ................... 13

b. Cockerell's counterarguments are unpersuasive. ............................... 16

2. Cockerell's related challenges to his conspiracy and money laundering convictions are likewise meritless. ............................................... 20

II. The Government's Closing And Rebuttal Arguments Cast No Serious Doubt On The Jury's Verdict. ................................ 23

A. Background ...................................................... 23

B. Standard of Review ........................................... 26

C. Discussion ...................................................... 26

III. The District Court Correctly Ordered Restitution To Compensate Federal Payers For Losses Caused By The Kickback Conspiracy. ............................................ 32

A. Background ...................................................... 32

B. Standard of Review ........................................... 36

C. Discussion ...................................................... 36

CONCLUSION ...................................................... 41

CERTIFICATE OF SERVICE ...................................... 42

CERTIFICATE OF COMPLIANCE .............................. 43

# TABLE OF AUTHORITIES

**Cases**

*Nye & Nissen v. United States,*
  336 U.S. 613 (1949) .................................................................16, 19

*United States v. Alvarez,*
  610 F.2d 1250 (5th Cir. 1980) ................................................. 21

*United States v. Arledge,*
  553 F.3d 881 (5th Cir. 2008) ................................................... 36

*United States v. Bennett,*
  874 F.3d 236 (5th Cir. 2017) ................................................... 31

*United States v. Davis,*
  53 F.4th 833 (5th Cir. 2022) ................................................... 22

*United States v. Escalante-Reyes,*
  689 F.3d 415 (5th Cir. 2012) (en banc).................................... 26

*United States v. Goodrich,*
  12 F.4th 219 (2d Cir. 2021) ..................................................... 37

*United States v. Greenlaw,*
  84 F.4th 325 (5th Cir. 2023) ................................................... 29

*United States v. Greenwood,*
  974 F.2d 1449 (5th Cir. 1992)................................................. 20

*United States v. Griffin,*
  324 F.3d 330 (5th Cir. 2003) ................................................... 26

*United States v. Iredia,*
  866 F.2d 114 (5th Cir. 1989) ................................................... 27

*United States v. King,*
  93 F.4th 845 (5th Cir. 2024) ................................35, 36, 38, 39

*United States v. Loeffel,*
    172 F. App'x 612 (5th Cir. 2006) ........................................... 31

*United States v. Lowenberg,*
    853 F.2d 295 (5th Cir. 1988) ................................................ 27

*United States v. Marchetti,*
    96 F.4th 818 (5th Cir. 2024) ........................... 11, 16, 17, 18, 29

*United States v. Mazkouri,*
    945 F.3d 293 (5th Cir. 2019) ................................................ 35

*United States v. Miles,*
    360 F.3d 472 (5th Cir. 2004) ..........................................17, 29

*United States v. Plezia,*
    115 F.4th 379 (5th Cir. 2024) .............................................. 21

*United States v. Ramirez-Velasquez,*
    322 F.3d 868 (5th Cir. 2003) ..........................................27, 31

*United States v. Ricard,*
    922 F.3d 639 (5th Cir. 2019) ................................................ 40

*United States v. Scott,*
    892 F.3d 791 (5th Cir. 2018) ..........................................13, 16

*United States v. Shah,*
    95 F.4th 328 (5th Cir. 2024), *petitions for cert. filed*, Nos. 24-23,
    24-5032, and 24-25 (July 3, 5, and 8, 2024) ......................12, 39

*United States v. Sharma,*
    609 F. App'x 797 (5th Cir. 2015) .......................................... 40

*United States v. Shelton,*
    694 F. App'x 220 (5th Cir. 2017) .......................................... 37

*United States v. St. Junius,*
    739 F.3d 193 (5th Cir. 2013) ................................................ 13

*United States v. Strickland,*
  509 F.2d 273 (5th Cir. 1975) ................................................ 30

*United States v. Vargas,*
  580 F.3d 274 (5th Cir. 2009) ................................................ 26

*United States v. Williams,*
  993 F.3d 976 (5th Cir. 2021) ................................................ 37

**Statutes**

18 U.S.C. § 371 ................................................................ 2, 20

18 U.S.C. § 1956 ..................................................................... 2

18 U.S.C. § 1957 .............................................................. 2, 20

18 U.S.C. § 3231 ..................................................................... 1

18 U.S.C. § 3663A ................................................................. 36

18 U.S.C. § 3664 ................................................................... 37

18 U.S.C. § 3742 ..................................................................... 1

28 U.S.C. § 1291 ..................................................................... 1

42 U.S.C. § 1320a-7b ........................................... 2, 12, 15, 25, 28, 30

**Other Authorities**

5th Cir. Pattern Jury Instructions (Criminal Cases) § 2.109A (2019
  ed.) ................................................................................. 13

# JURISDICTIONAL STATEMENT

Defendant-Appellant Quintan Cockerell appeals the judgment of conviction in his criminal case. The district court (Scholer, J.) had jurisdiction under 18 U.S.C. § 3231. Judgment was entered on July 17, 2024, ROA.1879, and Cockerell filed a timely notice of appeal on July 29, 2024, ROA.1889. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

# STATEMENT OF THE ISSUES

1.      Whether sufficient evidence supported Cockerell's convictions for conspiracy, violating the Anti-Kickback Statute, and money laundering.

2.      Whether challenged statements in the government's closing and rebuttal arguments cast serious doubt on the correctness of the jury's verdict.

3.      Whether the district court properly exercised its discretion in ordering Cockerell to pay restitution.

# STATEMENT OF THE CASE

## I.      Procedural History

A federal grand jury in the Northern District of Texas returned a superseding indictment charging Cockerell with conspiracy to defraud the United States and to pay and receive health care kickbacks,[1] in violation of 18

---

[1] Prior to trial, the government elected to proceed solely on the first object of this conspiracy. ROA.1128-1130.

U.S.C. § 371; one count of paying and receiving health care kickbacks, in violation of 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute"); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and three counts of money laundering, in violation of 18 U.S.C. § 1957. ROA.416-444.

Following trial, the jury found Cockerell guilty of the § 371 conspiracy (Count 1), the Anti-Kickback Statute violation (Count 4), and one substantive count of money laundering (Count 8), and found him not guilty of the money laundering conspiracy and the remaining two substantive counts of money laundering. ROA.1879. The district court sentenced Cockerell to 29 months of imprisonment, to be followed by two years of supervised release, and ordered him to pay $59,879,871 in restitution. ROA.1880-1883. Cockerell moved for release pending appeal, raising the sufficiency-of-the-evidence claim he now advances; the district court and this Court denied release. ROA.1920-1921; Order, No. 24-10687 (5th Cir. Aug. 29, 2024).

## II.    Statement of Facts

### A.    Cockerell works as a "marketer" for compounding pharmacies.

In 2013, Lewis Hall, Richard Hall, Dustin Rall, and Scott Schuster entered the compounding pharmacy business. ROA.2655, 2921-2922, 3329. Compounding pharmacies formulate topical creams by combining ingredients, and the industry was attractive at the time because insurers' reimbursements for

2

compounded creams tended to be "extremely high"; "[t]he talk in the medical industry was that it was going to be the next big moneymaker." ROA.3158.

Accordingly, the four men opened two compounding pharmacies: "Xpress," which accepted TRICARE[2] and other federal insurance programs, and "Rxpress," which for the most part did not accept federal insurance programs. ROA.2469, 2559. Operationally, the two pharmacies overlapped; they had relationships with many of the same physicians, they shared office space, and they shared the same marketers. ROA.2704-2714. The overriding focus at the pharmacies was on formulating creams that would be as lucrative as possible, and pharmacists, physicians, and marketers were all involved in developing combinations of ingredients that "would bill out the highest and be the most profitable." ROA.2469-2470.

Cockerell was one of the pharmacies' most effective marketers—and part of the pharmacies' "inner circle." ROA.2466, 2549. Cockerell had a background as a sales representative who sold medical devices to spinal surgeons (through his companies Texas SurgiSource and QSpine), ROA.2851, and he met Schuster through mutual friends in 2012, ROA.2467. As a marketer for the pharmacies, Cockerell became extremely effective at recruiting and maintaining

_____

[2] TRICARE is the federal health care benefit program for the U.S. military. ROA.3102-3103.

relationships with physicians who would prescribe the pharmacies' pain creams. ROA.2479. He was also intimately involved in developing new formulas that would be billed to insurers for the highest possible amounts, including by personally seeking out prescriptions for creams formulated by other pharmacies to see if Xpress and Rxpress could make their formulas just as expensive, or even more so. ROA.2470-2474, 2939.

The business was extremely lucrative. Between July 2014 and September 2016, TRICARE, the Department of Labor, Medicare, and the Department of Veterans Affairs paid Xpress over $59 million. ROA.3257-3258, 4138.

### B. Cockerell and his co-conspirators use kickbacks to bring prescriptions to the pharmacies.

To generate prescriptions, the pharmacies paid marketers like Cockerell "commissions" based on a percentage of billable prescriptions the marketers brought to the pharmacies by improperly influencing physicians to write them— *i.e.*, kickbacks. ROA.2465-2466, 3036, 3157-3158, 3327-3328. Cockerell concealed his receipt of kickbacks by having them paid in the name of his then-wife, who filled out paperwork but had no actual involvement in the business. ROA.2532-2533, 2860-2865; *see* ROA.2532-2534 (Schuster explaining this arrangement and surmising that Cockerell did this "to hide the fact that he was getting federal money").

The marketers, in turn, created "relationships with the doctors" they influenced to write prescriptions that Xpress and Rxpress would fill: they visited physicians' offices and gave them "preload[ed]" prescription pads that had been filled out in advance with the formulas the pharmacies wanted the physicians to prescribe. ROA.2476; *see* ROA.3329-3330 (marketer explaining that they made money by taking prescriptions to physicians' offices and, if the physicians "did business with us," sending the prescriptions to the pharmacies to be filled and billed to insurance); ROA.3160-3161 (marketer explaining that they told physicians that they could make more money at the conspirators' pharmacies, and having the physicians send prescriptions there "was really our"—*i.e.*, the marketers'—"decision"). The marketers provided financial and other incentives to induce physicians to write prescriptions to be filled by Xpress and Rxpress. For example, marketers offered physicians opportunities to participate in "management service organization[s]," or "MSOs," which allowed physicians to invest in those MSOs and to earn back money from each prescription they wrote.[3] ROA.2483-2484. Marketers also showered physicians with lavish

---

[3] As the conspirators knew, this arrangement was impermissible when billing federal payers, but Cockerell engaged in it despite that prohibition. ROA.2534-2535; *see* ROA.3151-3152 (witness explaining TRICARE generally would not pay for prescriptions that physicians had been induced to write because that would be "incentivizing or giving a benefit to the doctor in order for them to influence treating the patient").

vacations and expensive dinners to encourage them to continue writing prescriptions for Xpress and Rxpress. ROA.2485-2491. Marketers, including Cockerell, accompanied the physicians on these excursions. ROA.3344-3345. These incentives were crucial to the pharmacies' ability to obtain prescriptions; as one marketer later testified, "if we didn't pay the doctors, we would have had no business." ROA.3173.

Some marketers, including Cockerell, also recruited other marketers, known as "sub-reps." ROA.3066-3067, 3332. Cockerell employed his sub-reps through QSpine, one of his marketing companies, and he determined how much those sub-reps were paid. ROA.3038-3039, 3066-3067. One of the sub-reps Cockerell introduced to the pharmacies was Steve Bergman. ROA.3159-3160, 3175 ("Bergman was Quintan's guy."). Cockerell determined the percentage of the pharmacies' revenue from prescriptions that Bergman was paid as kickbacks. ROA.3318-3319. Cockerell also made clear that he (Cockerell) was entitled to an "override," or an additional percentage payable directly to Cockerell, on revenue attributed to prescriptions Bergman obtained. ROA.3319; *see also* ROA.3170-3173 (explaining concept of "override" payments); ROA.3272 (witness explaining Bergman was paid 40% of "net commissionable revenue" from prescriptions attributed to Bergman and Cockerell received an additional 20%).

One particular transaction involving Bergman and Cockerell, which became the basis of Count 4, took place in the first half of 2015. Christopher Ince, a physician, prescribed three topical creams to a patient (L.L.) covered by TRICARE on February 19, 2015. ROA.3270, 4139. Cockerell and Bergman each took a share of TRICARE's payments on those claims, with Cockerell earning 20%—a total of $1,723.53. ROA.3272-3273, 4140-4141.

Cockerell was one of the pharmacies' most successful marketers, and he earned—and spent—substantially as a result of his work. ROA.2539 ("We were on lots of trips and vacations, cars, jets, things like that."); ROA.3321 (Cockerell characterizing a $20,000 seat-color option on a Porsche as representing "'[o]ne scar cream really'"). Between August 2014 and June 2016, Xpress paid Cockerell nearly $2.5 million. ROA.3275-3276.

## III. Rulings Under Review

Cockerell challenges the sufficiency of the evidence underlying his convictions. ROA.1879-1887 (final judgment); *see* ROA.3388-3389 (district court orally denying motion for judgment of acquittal); ROA.1866-1872 (district court order denying motion for judgment of acquittal). Cockerell also challenges certain alleged misstatements of the law during the government's closing and rebuttal arguments. ROA.3652-3711. Finally, Cockerell challenges the district

court's restitution order.  ROA.1879-1887 (judgment including restitution); *see* ROA.3830-3831 (district court overruling objection to restitution amount).

## SUMMARY OF ARGUMENT

1.    The evidence at trial amply supported Cockerell's convictions. First, as to the substantive Anti-Kickback Statute offense (Count 4), the evidence permitted a rational jury to conclude that Cockerell, aiding and abetting Bergman, accepted a kickback in connection with Dr. Christopher Ince's 2015 prescriptions.  Cockerell was personally responsible for introducing Bergman to the larger kickback conspiracy; he directly received "override" payments for each prescription Bergman acquired for the pharmacies through his relationships with physicians; and the jury reasonably could infer that the particular transaction underlying Count 4 was consistent with the conspiracy's usual operations.  Although Bergman testified at trial that he merely received "commission[s]" in exchanging for "informing" physicians of "tools" to "help their practice," the jury was entitled to reject this self-serving statement.

Second, Cockerell is incorrect in arguing that, if this Court reverses his Anti-Kickback Statute conviction, reversal of his conspiracy and money laundering convictions would necessarily follow as a consequence.  Those convictions stand independently of Cockerell's Count 4 conviction.

2.     Cockerell's challenges to allegedly "inflammatory and prejudicial" statements during the government's closing and rebuttal arguments, all but one of which are reviewed only for plain error, are meritless.  The government's statements were generally consistent with the Anti-Kickback Statute and the jury instructions.    To the extent that the challenged statements might have erroneously implied that "marketing" alone is a crime, any prejudicial effect was mitigated by the district court's instructions to the jury as well as by the substantial evidence supporting Cockerell's convictions.

3.     The district court did not abuse its discretion in ordering Cockerell to pay restitution in the amount of the total payments to Xpress by federal entities over the course of the kickback conspiracy.  The Mandatory Victims Restitution Act ("MVRA") requires district courts to order restitution, including for losses caused by the reasonably foreseeable actions of a defendant's co-conspirators.  As the court here correctly found, the government demonstrated that the pharmacies' entire operation was fueled by kickbacks and the entire amount of federal payments to Xpress over the course of the conspiracy constituted loss.  Cockerell failed to carry his burden to rebut that evidence by showing that any portion of the prescriptions filled by the pharmacies was legitimate.

# ARGUMENT

## I. The Evidence Amply Supported Each Count Of Conviction.

Cockerell contends (Br. 23-30[4]) that the evidence was insufficient to support each of the three counts of conviction, but he focuses his argument primarily on his claim that the evidence failed to establish that Cockerell exercised or intended to exercise influence over health care decisions as part of the kickback charged in Count 4. The evidence amply established that Cockerell received the kickback that was the basis of Count 4 in exchange for his and Bergman's unlawfully influencing a physician to write prescriptions to be filled by Xpress. And the evidence likewise supported his conspiracy and money-laundering convictions. This Court should reject Cockerell's claim.

### A. Background

Following the government's case and again following the conclusion of the trial, Cockerell moved for a judgment of acquittal under Fed. R. Crim. P. 29. ROA.1642-1649 (motion following government's case); ROA.1689-1708 (motion following trial). As here, Cockerell argued in pertinent part that the evidence failed to adequately support a connection between Cockerell, Bergman, and the prescriptions underlying Count 4. ROA.1700-1703 (arguing

---

[4] Cockerell's opening brief is unpaginated. Citations to Cockerell's brief are to the pertinent page(s) of the electronic PDF copy filed in this Court.

Cockerell's conduct amounted to "[a]dvising Bergman of [a] marketing opportunity").

The district court denied Cockerell's motions. ROA.3388-3389 (oral ruling denying motion following government's case); ROA.1866-1872 (written order denying post-verdict motion). The court agreed with the government that the evidence showed that Cockerell wanted physicians to prescribe particular combinations of medications and provided pre-printed forms for that purpose, and that he received compensation directly tied to those prescriptions, which Cockerell concealed as payments to his wife. ROA.1869-1870. Addressing this Court's recent decision in *United States v. Marchetti*, 96 F.4th 818 (5th Cir. 2024), the district court explained that "*Marchetti* clarifies the distinction between payments that are permissible, such as payments to advertisers, and payments that are illegal, such as payments to induce referrals. And the trial evidence showed that [Cockerell] was not compensated as an advertiser; instead, he was compensated for inducing referrals, which is a violation of the [Anti-Kickback Statute]." ROA.1870.

### B.    Standard of Review

This Court "review[s] sufficiency of the evidence challenges de novo," but its review is "highly deferential to the verdict." *United States v. Shah*, 95 F.4th 328, 350 (5th Cir. 2024) (internal quotation marks omitted), *petitions for cert. filed*,

Nos. 24-23, 24-5032, and 24-25 (July 3, 5, and 8, 2024). "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (brackets and internal quotation marks omitted).

### C. Discussion

#### 1. Cockerell's challenge to his substantive Anti-Kickback Statute conviction lacks merit.

The Anti-Kickback Statute makes it a crime to

> knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b)(1)(A)-(B).

To establish a violation of this provision, the government must prove: (1) that the defendant solicited or received remuneration (directly or indirectly); (2) that the remuneration was solicited or received in return for referring an individual to a health care provider for the furnishing or arranging for the

furnishing of an item or service, or for the purchasing or ordering, or arranging for or recommending the purchasing or ordering, of an item or service; (3) that the item or service was reimbursable through a federal health care program; and (4) that the defendant acted knowingly and willfully. *United States v. St. Junius*, 739 F.3d 193, 210 n.18 (5th Cir. 2013); *see* 5th Cir. Pattern Jury Instructions (Criminal Cases) § 2.109A (2019 ed.); ROA.1669.

To prove a defendant guilty of an offense under an aiding-and-abetting theory, the government must establish "that the substantive offense occurred and that the defendant (1) associated with the criminal venture; (2) purposefully participated in the crime; and (3) sought by his actions for it to succeed." *United States v. Scott*, 892 F.3d 791, 798 (5th Cir. 2018) (internal quotation marks omitted). "[A] defendant need not commit each element of the substantive offense, so long as he aided and abetted each element." *Id.* at 798-799.

> a. Cockerell and Bergman accepted kickbacks in return for Bergman's improper recommendation and obtainment of prescriptions for the pharmacies.

The evidence at trial amply proved that Cockerell, aiding and abetting his "sub-rep" Steve Bergman, violated the Anti-Kickback Statute in connection with the prescriptions issued by Dr. Christopher Ince in 2015 that formed the basis of Count 4.

As pharmacy co-owner Scott Schuster testified, Cockerell was a member of the pharmacies' "inner circle" and participated in "all of the conversations" about the pharmacies' operations. ROA.2549. Cockerell was closely involved in the overarching scheme to "mak[e] money on TRICARE" by obtaining prescriptions for the pharmacies in exchange for kickbacks. ROA.3157-3158; *see* ROA.2475-2476 (making formulations as profitable as possible was "all we talked about"). Cockerell's value to the pharmacies consisted of his many relationships with prescribing physicians as well as his introduction of multiple sub-reps to the kickback scheme, including Bergman, who collectively generated substantial volumes of prescriptions for the pharmacies. ROA.3159-3160 (describing Cockerell's success as based on "[k]nowing doctors," "how to keep doctors close to you," "paying doctors on the side for their business, et cetera").

Cockerell personally dictated how much money Bergman was paid per prescription, and Cockerell himself received an "override" payment on each prescription Bergman obtained. ROA.3318-3319 (Cockerell directing an owner of the pharmacies to pay Bergman 40%, to pay Bergman as a W-2 employee, and to pay an "override" to Cockerell); ROA.4069 (text messages reflecting that Bergman had asked Cockerell "to be getting that credit direct"). The specific transaction that formed the basis of Count 4 was consistent with this arrangement: Dr. Ince prescribed three topical creams to a patient (L.L.) covered

by TRICARE on February 19, 2015, ROA.3270, 4139, and Cockerell and Bergman each took a share of TRICARE's payments on those claims, with Cockerell earning 20%—a total of $1,723.53, ROA.3272-3276 (forensic accountant tracing payment through payroll records in the name of Cockerell's wife); ROA.4140-4141.

This transaction was far from the only appearance of Dr. Ince in the scheme. Among all physicians appearing in the pharmacies' records, Dr. Ince was the second-highest source of Cockerell's income; he was one of only two physicians who accounted for over $800,000 in payments to Cockerell over the course of the entire conspiracy. ROA.3537-3538, 4367. Given all the other evidence tying Cockerell to the kickback scheme, the jury reasonably could rely on the volume of payments received by Cockerell that were tied to Dr. Ince's prescriptions in finding that the particular payments charged in Count 4 were unlawful kickbacks and that Cockerell aided and abetted the offense.

Based on this evidence, the jury reasonably found that Bergman and Cockerell accepted kickbacks in exchange for Bergman's improperly recommending the ordering of a product covered by federal insurers. ROA.3652 (closing argument explaining this theory); 42 U.S.C. § 1320a-7b(b)(1)(B). And although the evidence did not show direct interactions between Cockerell and Dr. Ince, it supported the inference that Cockerell aided and abetted Bergman's

conduct. In particular, the jury reasonably could find that Cockerell was associated with the kickback scheme and that he participated in the kickback violation charged in Count 4 by hiring Bergman as a sub-rep, introducing him to the pharmacies, specifying the details of Bergman's payment per prescription successfully sent to and billed by the pharmacies, and taking an override payment for himself on each prescription obtained this way. *See Scott*, 892 F.3d at 800 (affirming conviction on aiding-and-abetting theory where defendant "knew the details of the scheme," defendant took actions to ensure principal came into possession of marijuana to be transported, and principal "would never have come into possession of the marijuana" "[b]ut for [defendant's] actions"); *see also Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949) (holding that, although "no direct evidence" tied defendant to false invoices underlying substantive fraud counts, circumstantial evidence supported aiding-and-abetting theory, including defendant's involvement in "long and persistent scheme to defraud" that entailed "making of false invoices" by subordinates).

> b. Cockerell's counterarguments are unpersuasive.

Relying primarily on this Court's decision in *United States v. Marchetti*, 96 F.4th 818 (5th Cir. 2024), Cockerell contends (Br. 24-27) that the evidence failed to prove that Cockerell or Bergman exercised "'undue influence'" over Dr. Ince. But the evidence discussed above permitted the jury to conclude that Bergman

did exactly that, and the government's theory of liability was fully consistent with *Marchetti*.

In *Marchetti*, this Court stressed that, in Anti-Kickback Statute cases, the government must prove that recipients of kickbacks "intended 'improperly to influence' those who make healthcare decisions on behalf of patients." 96 F.4th at 827 (quoting *United States v. Miles*, 360 F.3d 472, 481 (5th Cir. 2004)) (brackets and citation omitted). Particularly where, as here, the recipients of kickbacks are not themselves personally making health care decisions, this Court has framed "[t]he central question" as whether the recipients "inten[ded] to induce 'referrals,' which is illegal," or "inten[ded] to compensate advertisers, which is permissible[.]" *Id.* at 826 (internal quotation marks omitted).

The evidence at trial powerfully demonstrated that Cockerell and his co-conspirators intended improperly to influence physicians to write prescriptions to be filled by the pharmacies in violation of the Anti-Kickback Statute. As Schuster, one of the pharmacies' co-owners, explained, the entire goal of the pharmacies was to formulate, and induce physicians to prescribe, the most expensive possible compounded creams so that the pharmacies could bill for them. ROA.2465-2466 (characterizing the scheme as "making the most expensive" creams with which to bill TRICARE); ROA.2469-2470 (explaining that pharmacists and "every marketer and rep" "constantly would be looking to

see what would bill out the highest and be the most profitable"). These formulations were "preload[ed]" onto pre-written prescription pads, which marketers brought to physicians. ROA.2476, 2493-2496 (explaining that the pads allowed physicians to prescribe "three to five" creams at once and allowed refills even after multiple failed attempts to contact a patient, so that "[t]he marketers and the pharmacy" would continue to get paid); ROA.2812 (physician opining that use of pre-written prescription pads "doesn't make sense" as a matter of "general medical care that's individualized"). And the record is replete with evidence that the marketers improperly influenced physicians to write these prescriptions, including by sending them on lavish vacations. *See, e.g.*, ROA.2486-2491 (purpose of taking a physician to Panama was "to make sure that [he] continued to write prescriptions"); ROA.3344-3345 (recounting trips with Cockerell "as part of the efforts to obtain these prescriptions"). In short, as another marketer, Michael Ranelle, put it, "if we didn't pay the doctors, we would have had no business." ROA.3173. This relationship between the pharmacies, marketers, and physicians is thus indistinguishable from the sort of relationship, described in *Marchetti*, that violates the Anti-Kickback Statute: "Medical service provider pays salesman, salesman makes choice about service provider, salesman is never overruled." 96 F.4th at 827.

Cockerell focuses (Br. 26) on the lack of direct evidence of a connection between Cockerell and Dr. Ince.  But this argument ignores the availability of an aiding-and-abetting theory of liability; to convict Cockerell of aiding and abetting Bergman, it was not necessary for the jury to conclude that Cockerell *directly* engaged in the conduct that violated the Anti-Kickback Statute.  *See Nye & Nissen*, 336 U.S. at 619.  And the evidence permitted the jury to conclude that Cockerell aided and abetted Bergman's conduct in a manner consistent with the operation of the overarching scheme.  Bergman was Cockerell's sub-rep— "Quintan's guy," ROA.3175—and Bergman testified that he used the pharmacies' "script pad[s]" or "order sheet[s]" that directed physicians to check off creams to be prescribed, and that he attended "promotional dinners" for physicians, ROA.2901, 2904.  The jury reasonably could conclude that Bergman and Cockerell accepted kickbacks in exchange for Bergman's improper influence of Dr. Ince's writing of prescriptions.  Although, as Cockerell emphasizes (Br. 16), Bergman testified on cross-examination that he merely "inform[ed]" physicians of "tools" to "help their practice" and asserted that he was only paid in "commission[s]," not "kickback[s]," the jury was entitled to reject this self-serving testimony.  This Court may not revisit the jury's credibility determinations on appeal.  *See United States v. Greenwood*, 974 F.2d 1449, 1458

(5th Cir. 1992) (questions as to credibility generally are "beside the point in reviewing a sufficiency claim").

Finally, Cockerell briefly asserts (Br. 27) that the government "conceded in closing argument" that Bergman was merely "marketing" to Dr. Ince. As discussed below, this statement, read in context, was fully consistent with the government's theory that Bergman improperly influenced Dr. Ince's prescriptions in exchange for kickbacks and does not reflect a concession that he engaged in mere marketing of the sort that *Marchetti* held does not violate the Anti-Kickback Statute.

### 2. Cockerell's related challenges to his conspiracy and money laundering convictions are likewise meritless.

Cockerell further challenges (Br. 28-30) his convictions on Count 1 (conspiracy to defraud the United States, in violation of 18 U.S.C. § 371) and Count 8 (money laundering, in violation of 18 U.S.C. § 1957), but these arguments depend entirely on his argument regarding the Anti-Kickback Statute count and are therefore meritless for the reasons discussed above.

Further, even if Cockerell's sufficiency challenge to Count 4 were meritorious, he would be incorrect in arguing that it would require reversal of his remaining two convictions.

*First*, as to Count 1, the government was required to prove: "(1) an agreement between two or more people to pursue an unlawful objective; (2) the

defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the conspirators in furtherance of the conspiracy's objective." *United States v. Plezia*, 115 F.4th 379, 390 (5th Cir. 2024) (internal quotation marks omitted). Cockerell's only argument as to Count 1 is that the superseding indictment and the government at trial "narrowed" Count 1 "to one overt act – Count 4," and the government "failed to prove Count 4." Br. 28-29. But the government was merely required to prove an overt act in furtherance of the conspiracy; it was *not* required to prove that the overt act was itself a crime. *United States v. Alvarez*, 610 F.2d 1250, 1255 n.5 (5th Cir. 1980) ("The overt act need not, however, be criminal in nature or create any danger to the victim or society; it suffices if, however innocent, the act furthers the criminal venture."). The evidence discussed above established that, even if the particular transaction underlying Count 4 was not itself a criminal Anti-Kickback Statute violation, it was a part of Cockerell's larger scheme to unlawfully induce prescriptions for the pharmacies. *See* ROA.2475-2476 (maximizing reimbursements and making creams as profitable as possible was "all we talked about"); ROA.2486-2491 (summarizing Cockerell's lavish trips with physicians to keep them writing prescriptions).

*Second*, as to Count 8, the government was required to prove: "(1) property valued at more than $10,000 that was derived from a specified unlawful activity,

(2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity." *United States v. Davis*, 53 F.4th 833, 843 (5th Cir. 2022) (internal quotation marks omitted). As with Count 1, Cockerell argues only that Count 8 depended on Count 4, claiming that "the Count 4 conduct was the only possible conduct" that could have produced the requisite proceeds of specified unlawful activity. Br. 29-30. Cockerell is incorrect for the simple reason that the proceeds of specified unlawful activity identified in Count 8 were not confined to proceeds of the substantive Anti-Kickback Statute violation charged in Count 4—they also included proceeds of the overarching Count 1 conspiracy. ROA.439. As the government's forensic accountant explained at trial, Count 8 was based on a $75,928 wire transfer, over $68,086 of which "had to have come from" payments to Cockerell by Xpress.[5] ROA.3280-3282, 4156. Cockerell's assertion that Count 8 depended entirely on the far smaller Count 4 transaction is illogical and should be rejected.

---

[5] Indeed, Count 8 could not possibly have been based on the proceeds of Count 4 alone; Cockerell only received $1,723.53 from that specific Anti-Kickback Statute violation, ROA.3272-3273, 4140-4141, which would not suffice to satisfy § 1957's $10,000 threshold.

## II. The Government's Closing And Rebuttal Arguments Cast No Serious Doubt On The Jury's Verdict.

Next, Cockerell contends (Br. 31-34) that the government made "inflammatory and prejudicial" statements during its closing and rebuttal arguments that entitle him to a new trial. Not so. Viewed in context, these statements were generally correct statements of the law and facts, and even if they might have reflected an excessively broad theory of Anti-Kickback Statute liability, they were harmless.

### A. Background

During its closing argument, the government explained each of the elements of the charged offenses in detail. With respect to Count 4, the government explained the elements in terms of items on a checklist. It stated that "[t]he first item" was "that Quintan Cockerell got remuneration, any remuneration," and that

> the second and third item in this checklist is this remuneration, this money, was in exchange for referring or promoting, that is, recommending the ordering of a product or service that is reimbursed by federal insurance, TRICARE.

> And that's exactly what Quintan Cockerell did here. When he passed out these script pads, when he told doctors about the product, when he put [a pharmacist] on the phone with doctors to tell them how well these creams worked, that's what he was doing. He was marketing. He was recommending the specific products that these doctors were prescribing. That's what he was getting money for, and he was doing it over and over and over. He got

23

these payments that you'll see in front of you because it was connected to those prescriptions.

Now, [the forensic accountant] traced the money paid to Quintan Cockerell for Count 4. He showed you how the money came in from Dr. Ince for writing three prescriptions and how Quintan Cockerell was paid a percentage of that.

And members of the jury, it doesn't matter that . . . Bergman did some of the actual marketing in this case because Quintan Cockerell got the money. In addition, he aided and abetted Bergman by introducing him to the pharmacy, bringing him in, dictating the breakdown of his commission payments and how that worked, as you'll see in this text message.

ROA.3652-3653.

During his closing argument, Cockerell's counsel repeatedly emphasized in response that "marketing," standing alone, does not violate the Anti-Kickback Statute. *See* ROA.3676 ("That means criminalize marketing. There's no law. . . . It doesn't exist. Recommending is what marketers do . . . . Marketing is what marketers do. . . . That's what happened.").

The government addressed this theme in its rebuttal, stating:

And here's where I'll ask you to look at the law, is that the defense says that there's no law against marketing. Boy, that is misleading. He's right. There isn't a law against marketing. But there is a law against getting paid kickbacks for marketing.

Yeah. Medical companies need marketers, and they can pay them. There's an exception for how. They have to be a bona fide

employee.  That's it.  Scott Schuster told you that all the lawyers told them that.[6]

ROA.3708.  Cockerell's counsel objected, stating that this was "a misstatement of the law," and the district court instructed the jury in response: "Ladies and gentlemen of the jury, I'm going to ask again that you [] understand this is lawyer argument and the law is as contained . . . in the jury charge."  ROA.3708.

The government resumed its rebuttal argument, explaining that "what matters the most here" is "[r]ecommending the purchasing, leasing, ordering, or arranging for any item."  ROA.3709.  The government continued:

> There is an exception. . . .  That if these marketers had been hired and treated as employees, they could have been paid marketers.  But that's not what happened.  Instead, the evidence was they papered it up to make it look like they were employees.  And because they deliberately failed to meet the exception, they're left with the rule, and that is this: You can't pay people to recommend a TRICARE product as an inducement.

ROA.3709.  The government also described Cockerell's efforts to connect physicians with the pharmacies' lead pharmacist to encourage them to prescribe

---

[6] This "bona fide employee" defense is a safe-harbor provision of the Anti-Kickback Statute that provides that the portion of the statute defining the kickback offense "shall not apply to . . . any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services . . . ."  42 U.S.C. § 1320a-7b(b)(3)(B).  As Schuster indeed testified, the pharmacies received legal advice to the effect that Xpress "basically had to have bona fide employees" because it billed federal payers, but marketers, including Cockerell, "pushed back hard" on being treated as "actual employee[s] of the pharmacy." ROA.2519-2520.

the pharmacies' compounded creams, concluding: "That is recommending a product for the ordering – that's recommending the ordering of a product. And that is what you're not allowed to get a kickback to do, but he took one anyway." ROA.3711-3712.

## B. Standard of Review

This Court reviews preserved claims that prosecutors made improper remarks during closing arguments for abuse of discretion, *United States v. Griffin*, 324 F.3d 330, 361 (5th Cir. 2003), and reviews unpreserved claims for plain error, *United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009). Plain error requires (1) an error (2) that was clear or obvious and (3) that affected Cockerell's substantial rights, and (4) this Court will exercise its discretion to remedy the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Escalante-Reyes*, 689 F.3d 415, 419 (5th Cir. 2012) (en banc).

## C. Discussion

Cockerell identifies five purported "misstatements" in the government's closing and rebuttal arguments. Br. 31-34. He only lodged a contemporaneous objection to the third statement he identifies (the statement explaining that "there is a law against getting paid kickbacks for marketing," but medical companies can pay "bona fide employee[s]," ROA.3708), so his challenges to

the other statements are reviewed for plain error. His challenges are meritless regardless of the standard of review.

"A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989) (per curiam) (internal quotation marks omitted); *see also United States v. Ramirez-Velasquez*, 322 F.3d 868, 874 (5th Cir. 2003) ("[P]rosecutorial remarks alone rarely are sufficient to warrant reversal."). To constitute reversible error, a prosecutor's comments must be both "inappropriate and harmful." *United States v. Lowenberg*, 853 F.2d 295, 301 (5th Cir. 1988) (internal quotation marks omitted). In assessing the prejudicial effect of inappropriate remarks, "[t]he determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *Iredia*, 866 F.2d at 117. That determination requires consideration of: (1) "the magnitude of the prejudicial effect of the statements"; (2) "the efficacy of any cautionary instruction"; and (3) "the strength of the evidence of the defendant's guilt." *Id.* These factors weigh in favor of affirmance, particularly through the lens of plain-error review, which applies to Cockerell's challenges to all but one of the statements here.

*First*, the government's arguments generally were not "inappropriate" because they tracked the governing law and the language of the Anti-Kickback

Statute, and the prejudicial effect of any "inappropriate" comments was minimal. For example, the statement that "this remuneration, this money, was in exchange for referring or promoting, that is, recommending the ordering of a product or service that is reimbursed by federal insurance," ROA.3652, and the statement that Cockerell was paid for "recommending the specific products that these doctors were prescribing," ROA.3652-3653, mirrored statutory language. 42 U.S.C. § 1320a-7b(b)(1) (criminalizing remuneration in return for "referring," "purchasing," or "arranging for or recommending purchasing" health care items or services). The government also explicitly distinguished between "marketing" standing alone, which Cockerell's counsel emphasized in his closing is not a crime, ROA.3676, and "marketing" in exchange for kickbacks, ROA.3708. And, throughout the trial, the government consistently emphasized its theory that Cockerell had accepted remuneration in exchange for persuading physicians to prescribe the pharmacies' creams, not merely for abstract "marketing" services. *See* ROA.2418-2419 (opening describing kickbacks Cockerell accepted "for every tube of cream or bottle of medication that he convinced a doctor to prescribe"); ROA.2423-2424 ("[Cockerell's company] QSpine was in the business of convincing doctors to sign these lucrative prescriptions."); ROA.3634 (describing "plan" as "to pay marketers a cut of each [prescription] to convince doctors to sign their patients up"). Thus,

Cockerell is wrong to assert that the government "told the jurors that the precise type of marketing that *Marchetti* and *Miles* expressly permit is a crime" (Br. 31); the government repeatedly emphasized its theory that Cockerell accepted kickbacks not merely for "marketing" but for improperly influencing physicians to write prescriptions. *See United States v. Marchetti*, 96 F.4th 818, 826 (5th Cir. 2024) (distinguishing between legal compensation of advertisers and illegal inducement of referrals); *United States v. Miles*, 360 F.3d 472, 480-481 (5th Cir. 2004).

Even if the government's comments could have created the misimpression that "marketing" alone is a crime, the district court's instructions to the jury— the correctness of which Cockerell does not challenge—clearly required it to find all of the elements of an Anti-Kickback Statute violation beyond a reasonable doubt, including that the remuneration was solicited or received in return for a referral for, or recommendation or purchase of, covered health care items or services and that Cockerell acted knowingly and willfully. ROA.1669. Those instructions mitigated the prejudicial effect of any misimpression created by the challenged statements. *See Marchetti*, 96 F.4th at 831 (stating in response to challenge to materially identical jury instructions that "they are quite clear that the payments have to be made in order to induce an unlawful referral"); *see also United States v. Greenlaw*, 84 F.4th 325, 359 (5th Cir. 2023) (holding prejudicial

effect of prosecutor's comments "was minimal" in part because of district court's accurate jury instructions).

Cockerell also briefly challenges (Br. 31-32) the government's discussion of the "bona fide employee" defense, but the quoted comment—that an "exception" allows medical companies to pay bona fide employees "kickbacks for marketing," ROA.3708—accurately conveyed that the "bona fide employee" defense existed. 42 U.S.C. § 1320a-7b(b)(3)(B) (excepting from the Anti-Kickback Statute "any amount paid by an employer to an employee . . .").[7]

*Second*, the district court promptly offered a cautionary instruction in response to the one statement to which Cockerell contemporaneously objected. ROA.3708 ("Ladies and gentlemen of the jury, I'm going to ask again that you [] understand this is lawyer argument and the law is as contained . . . in the jury charge."). The court offered similar instructions at the start of trial, ROA.2386-2387 ("Statements, arguments, and questions by lawyers are not evidence."); as

---

[7] Cockerell also briefly asserts (Br. 34) that the government presented a "constant . . . narrative about secretive payments to" Cockerell's then-wife. Cockerell does not specifically identify any actual statements regarding any such payments (*see* Br. 32-33). In any event, as noted above (p.4, *supra*), Cockerell indeed used his spouse as a conduit through which to receive his kickbacks. Cockerell's effort to conceal his wrongdoing, while hardly a primary focus of the trial, was relevant evidence of Cockerell's consciousness of guilt. *See generally United States v. Strickland*, 509 F.2d 273, 276 (5th Cir. 1975) ("It is obvious that . . . concealment and falsification may reveal a consciousness of guilt and so help to carry the prosecutor's burden . . . .").

part of its final instructions, ROA.3610 ("The questions, statements, objections, and arguments made by the lawyers are not evidence."); prior to the government's closing argument, ROA.3630 (closing arguments are "argument[s] by the lawyers" and "not evidence"); and during Cockerell's counsel's closing argument ("It's attorney argument and the law is contained in the charge."), ROA.3665. These repeated admonitions, which this Court presumes the jury obeyed, "helped mitigate any prejudicial effect" of the government's statements. *United States v. Bennett*, 874 F.3d 236, 255 (5th Cir. 2017).

*Third*, the evidence of Cockerell's guilt was substantial. *See* pp.12-22, *supra*. Cockerell was convicted not because he was paid for "marketing," but because he and others at Xpress and Rxpress participated in a scheme to bilk TRICARE and other federal payers by concocting the most lucrative possible pain creams and inducing physicians to prescribe them. *See Bennett*, 874 F.3d at 255-256 (rejecting prosecutorial misconduct claim where defendant's "conviction was supported with strong evidence of her guilt"); *Ramirez-Velasquez*, 322 F.3d at 875 ("Further weighing against reversal of Ramirez's conviction is substantial evidence pointing to his guilt."); *United States v. Loeffel*, 172 F. App'x 612, 617-618 (5th Cir. 2006) (per curiam) (holding that comment suggesting jury could convict even if defendant formed necessary intent *after*

allegedly fraudulent conduct did not "cast serious doubt on the correctness of the jury's verdict" in light of "the context of the strength of the circumstantial evidence of Loeffel's intent at the time . . . and the efficacy of the judge's immediate curative statement"). For all of these reasons, this Court should reject Cockerell's claim.

## III. The District Court Correctly Ordered Restitution To Compensate Federal Payers For Losses Caused By The Kickback Conspiracy.

Finally, Cockerell argues (Br. 35-38) that the district court erred in ordering restitution in the total amount of payments made by federal entities in connection with the pharmacies' kickback scheme. Substantial trial evidence supported the district court's finding that the kickback scheme permeated the pharmacies' operations, and Cockerell failed to offer any evidence that any prescription was legitimate. This Court should affirm the restitution order.

### A. Background

At trial, the government introduced evidence that, over the course of the conspiracy, TRICARE, the Department of Labor, Medicare, and the Department of Veterans Affairs paid Xpress $59,879,871. ROA.3257-3258, 4138. That dollar amount was derived from the pharmacies' own billing records (occasionally referred to as the pharmacies' "PK data"), ROA.3257, which were also the basis for the pharmacies' calculation of kickback payments to marketers, ROA.3258-3270.

Prior to and during sentencing, the parties extensively debated restitution. In its draft Presentence Investigation Report ("PSR"), the Probation Office recommended ordering approximately $34.7 million in restitution, which it calculated based on payments to the pharmacies for prescriptions written by physicians directly related to Cockerell himself. ROA.4496 (limiting calculation to pharmacy commission reports that listed prescriptions connected to "Quintan," "Kristin Cockerell," or "QSpine"); ROA.4507.

Both Cockerell and the government objected. Cockerell argued that the total payments by only federal (not private) payers "associated with Cockerell-related doctors" totaled approximately $7.6 million, and he further argued that the court should deduct "[t]he total cost of goods sold" from that amount, reducing the restitution amount to approximately $5.8 million. ROA.4518. Cockerell "further object[ed]" that the restitution amount should be $0, claiming that "[t]he payment of kickbacks does not render the treatment and services provided medically unnecessary . . . or that the federal health care program would not have ordinarily paid for the product or service in question." ROA.4519.

The government, in turn, contended that the appropriate amount of restitution was $59,879,871. ROA.4527. The government maintained that, because Cockerell had been convicted of a conspiracy to defraud the United

States that entailed billing for compounded creams that had been formulated to be as expensive as possible, restitution should track the total payments by federal payers to Xpress over the course of that conspiracy.  ROA.4523-4527.

In an addendum to the PSR, the Probation Office agreed that the total amount of restitution should "reflect [that] the defendant is responsible for the entire amount of the improper value to be conferred."  ROA.4539.  Cockerell filed multiple further objections, reiterating, among other things, that the restitution amount "should be $0," ROA.4560-4561, and asserting that no Cockerell-associated physician wrote a prescription "for *any* reason other than the beneficiaries' medical needs," ROA.4600.  Cockerell also filed a lengthy brief dedicated exclusively to the calculation of the loss amount and restitution.  ROA.43 (docket reflecting order regarding Cockerell's brief, filed at DE 1203).

At sentencing, the parties discussed the calculation of loss and the imposition of restitution at length.  Cockerell argued, among other things, that the "correct" calculation of the "improper benefit conferred" in connection with restitution should be based only on the single kickback underlying Cockerell's substantive Anti-Kickback Statute conviction, ROA.3805, and he further contended that restitution should be offset by the cost of the creams the pharmacies produced, ROA.3808-3809.

The district court responded with several questions regarding the pervasiveness of the kickback scheme at the pharmacies, noting that this Court has held that, where the government proves by a preponderance of the evidence that an entire health care operation is permeated with fraud, the burden shifts to the defendant to offer rebuttal evidence of legitimate billings. ROA.3809-3813 (discussing *United States v. King*, 93 F.4th 845 (5th Cir. 2024), and *United States v. Mazkouri*, 945 F.3d 293 (5th Cir. 2019)). The court continued, "But if I find, and I so find, that fraud, according to the jury verdict and what I heard in this case, is so pervasive that separating legitimate [from] fraudulent conduct is not reasonabl[y] practicable . . . . But it shifts to you. And so where have you shown me that you carved out the legitimate from the illegitimate?" ROA.3813-3814. Cockerell agreed that he had not separated purportedly legitimate from illegitimate billings. ROA.3816. After hearing from the government, the court overruled Cockerell's objections and ordered Cockerell to pay $59,879,871 in restitution, reasoning in part that Cockerell had "not carried his burden to establish that the treatment provided [to] healthcare beneficiaries was legitimate and the healthcare agencies would have paid for the treatment but for [Cockerell]'s fraud." ROA.3828-3831, 4614. The court ordered that Cockerell be held "jointly and severally liable for all foreseeable losses within the scope of the conspiracy to defraud the United States." ROA.3830-3831.

## B.    Standard of Review

This Court "reviews the legality of a restitution order de novo and the amount of the restitution order for an abuse of discretion." *United States v. Arledge*, 553 F.3d 881, 897 (5th Cir. 2008).

## C.    Discussion

The MVRA provides that, when a defendant is convicted of "an offense against property," the district court "shall order . . . that the defendant make restitution to the victim of the offense . . . ." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). "[T]he term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2).

Accordingly, this Court has explained that "members of a conspiracy may be held jointly and severally liable [under the MVRA] for *all foreseeable losses* within the scope of their conspiracy regardless of whether a specific loss is attributable to a particular conspirator." *King*, 93 F.4th at 854 (internal quotation marks omitted; emphasis added). As the Second Circuit has explained, the MVRA's "statutory language does not limit restitution to losses

caused by the actions of [a particular] defendant during the conspiracy, but also embraces losses flowing from the reasonably foreseeable actions of that defendant's co-conspirators," including such actions that advance the "common plan of the conspiracy." *United States v. Goodrich*, 12 F.4th 219, 228 (2d Cir. 2021) (internal quotation marks omitted); *see United States v. Shelton*, 694 F. App'x 220, 223-224 (5th Cir. 2017) (per curiam) (rejecting as "foreclosed by our precedent" argument that restitution under the MVRA should have been limited to victims directly harmed by defendant's own criminal conduct (collecting cases)).

The MVRA states that "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government" and that "[t]he burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e). This Court "ha[s] interpreted these two statutory sentences to establish a burden-shifting framework for loss-amount calculations. The Government first must carry its burden of demonstrating the actual loss . . . by a preponderance of the evidence. Then the defendant can rebut the Government's evidence." *United States v. Williams*, 993 F.3d 976, 980-981 (5th Cir. 2021). "When the exact amount of actual loss is not clear, the district court is permitted to make reasonable estimates supported by the

record." *King*, 93 F.4th at 851. "Actual loss for restitution purposes is offset by the amount of the legitimate services provided to the patients in healthcare fraud cases." *Id.*

The district court's restitution order was entirely consistent with the above requirements. The court had an ample foundation in the trial record for finding that the pharmacies' entire operation was fueled by kickbacks and that the entire amount of federal payers' payments to Xpress during the conspiracy constituted loss because they would not have paid for prescriptions obtained as a result of kickbacks. As Schuster explained, the conspirators, including Cockerell, "constantly would be looking to see what would bill out the highest and be the most profitable," and the pre-printed prescription pads the marketers distributed were designed "[s]o the profitability would be at the maximum." ROA.2469-2470. Cockerell himself helped the conspirators find ever more lucrative combinations of ingredients, including by seeking out examples from other pharmacies, to make sure there were no "dollars left on the table." ROA.2470-2476. And the conspirators obtained prescriptions for these maximally expensive creams by paying the "marketers," including Cockerell, kickbacks, and by providing substantial incentives to prescribing physicians. ROA.2465-2466, 2485-2491, 3157-3158, 3327-3328. The government also showed that the compounded cream formulations were not designed in response

to patient need or medical necessity.  ROA.2771-2772 (physician explaining that compounded creams should combine ingredients "specifically for an individual's tailored needs"); ROA.2812 (physician opining that the use of pre-printed prescription pads "doesn't make sense and [is] not customary" and does not reflect care tailored to patients' needs).  And it presented evidence that federal payers would not have paid for prescriptions had they known that physicians had been provided with incentives.  ROA.3121-3122, 3151-3152.

Under this Court's precedent, the government's substantial showing at trial shifted the burden to Cockerell to offer rebuttal evidence of legitimate medical expenses.  As Cockerell acknowledged at sentencing, ROA.3816, he did not do so.  Accordingly, the district court correctly used the entire amount of federal payers' payments to Xpress as the basis for its restitution award.[8] *Compare King*, 93 F.4th at 853 (observing that defendants "failed to offer rebuttal

---

[8] This amount appropriately included all payments connected to the conspiracy, not only to physicians personally associated with Cockerell's "marketing."  *See King*, 93 F.4th at 854 (rejecting argument that restitution should be limited to amount defendants personally received in kickbacks because they were convicted of conspiracy, so "their restitution [includes] any losses that Medicare 'directly' suffered *from their agreement*" (emphasis added)).  Indeed, if anything, the restitution award here was conservative insofar as it was limited to payments to Xpress by federal payers and did not include any payments by private insurance companies.  *See United States v. Shah*, 95 F.4th 328, 388-389 (5th Cir. 2024) (holding private insurers were MVRA "victims" of kickback conspiracy), *petitions for cert. filed*, Nos. 24-23, 24-5032, and 24-25 (July 3, 5, and 8, 2024).

evidence of *any* legitimate medical expenses billed to Medicare that should be set off"), *with United States v. Ricard*, 922 F.3d 639, 659 (5th Cir. 2019) (holding that defendant was "entitled to an offset against the actual loss amount" in part because she "pointed to trial testimony suggesting" legitimate medical services had been provided).

Cockerell offers no sound reason to call the restitution order into question. Cockerell asserts that "[t]here was no restitution hearing," "[t]he government introduced no witnesses or exhibits," and he "was never allowed to meet his burden to offset fraud." Br. 35, 37. Those statements mischaracterize the record. The parties extensively debated loss and restitution prior to and during the sentencing hearing, including the extent to which the pharmacies provided legitimate medications and whether the restitution award should be reduced accordingly. *See* ROA.4531 (government arguing "there is no legitimacy to the compound medications"); ROA.4558-4559 & n.19 (Cockerell contending that no evidence demonstrated that any particular prescription was illegitimate); *see also United States v. Sharma*, 609 F. App'x 797, 803-804 (5th Cir. 2015) (per curiam) (rejecting argument that denying request for offsets against restitution denied defendants due process in light of decades of precedent "shifting to the defendant the burden of proving offsets" as well as notice that "medical necessity" would be "at issue" at sentencing). Cockerell now merely asserts

without support that "the services here were not inherently illegitimate" (Br. 37), but the evidence discussed above reveals quite the opposite. Based on the extensive filings debating this issue and the extensive trial record on which the district court relied, the court correctly found that the pharmacies' operations were designed to maximize profits through kickbacks, not serve patients' medical needs. Because Cockerell did not demonstrate that the pharmacies provided any legitimate medical services, he failed to carry his burden to show that the restitution amount should be reduced.

## CONCLUSION

For these reasons, this Court should affirm the district court's judgment.

Respectfully submitted,

ANTOINETTE T. BACON
Supervisory Official

s/ Andrew Laing
ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov

February 20, 2025

**CERTIFICATE OF SERVICE**

I certify that on February 20, 2025, I caused the foregoing brief to be served upon all Filing Users through the Court's Case Management/Electronic Case Files ("CM/ECF") system.

s/ Andrew Laing
ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 8,797 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared in a proportionally spaced, 14-point font in text and footnotes using Word for Microsoft 365.

s/ Andrew Laing
ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov